IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100071203988939 AND 100051024013784 STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 3:21-mj-423<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel R. Genck, Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    This affidavit is in support of an application for a search warrant for information associated with certain Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A and for things described in Attachment B.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703 (b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with the users' IDs.

2.    I am a Special Agent with the FBI and have been since March 2009.  I am currently assigned to the Minneapolis Division, Grand Forks Resident Agency.  I have conducted investigations related to national security matters, public corruption, violent crimes, drugs, and

crimes against children.  I have also served in leadership roles with the FBI in the Minneapolis

and New Orleans Field Offices, as well as at FBI Headquarters in Washington, D.C.  I have

received specialized training in investigative strategies to include methods of interviewing,

elements of effective interrogation, crime scene management and the effective processing of

forensic evidence. I have also received formal legal training, with the specific study of the

protections granted within the United States Constitution. My duties include the investigation of

violent crimes occurring within Indian Country, specifically on the Spirit Lake Reservation,

including violations of Title 18, United States Code, Sections 2243(a) (Sexual Abuse of a Minor)

and 1153 (Offenses in Indian Country), 2252 (Certain Activities Relating to Material Involving

the Sexual Exploitation of Minors), and 2252A (Certain Activities Relating to Material

Constituting or Containing Child Pornography), (the "Subject Offenses") (the "**Subject**

**Offenses**").

       3.      As a Federal Agent, I am authorized to investigate violations of laws of the

United States and to execute warrants issued under the authority of the United States.

       4.      The statements contained in this affidavit are based on: information provided by

other agencies; written reports about this and other investigations that I have received, directly or

indirectly, from other law enforcement agents; information gathered from physical searches

conducted by law enforcement agents; independent investigation; and my experience, training

and background as a Special Agent with the FBI.  Since this affidavit is being submitted for the

limited purpose of securing a search warrant, I have not included each fact known to me

concerning this investigation.  I have set forth only the facts that I believe are necessary to

establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of

the **Subject Offenses** are located within the following Facebook account, **ZAVE ASHTON,**

Facebook account number 100071203988939, and **ZAVE ASHTON**, Facebook username "xavier.buckles.3", Facebook account number 100051024013784 (hereinafter **"Subject Accounts"**).

     5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the **Subject Offenses** have been committed and that information relevant to the investigation may be maintained in the Facebook account described below. This includes, but is not limited to, evidence of the identity of the person maintaining the accounts and other social networking accounts associated with the **Subject Account**. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## STATUTORY AUTHORITY

     6.     Title 18, United States Code, Section 2243(a) provides, in part, that whoever in the special maritime and territorial jurisdiction of the United States knowingly engages in a sexual act with another person who has attained the age of 12 years but has not attained the age of 16 years and is at least four years younger than the person so engaging or attempts to do so shall be fined under this title, imprisoned not more than 15 years, or both.

     7.     Title 18, United States Code, Section 2252 prohibits a person from knowingly distributing or receiving a visual depiction of a minor engaging in sexually explicit conduct, as defined in 18 U.S.C. §2256(2)(A), when such visual depiction was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

     8.     Title 18, United States Code, Section 2252A(a)(2) and (b)(1) prohibits a person from knowingly distributing or receiving any child pornography, as defined in 18 U.S.C. §2256(8), when

such child pornography was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or attempting or conspiring to do so.

9.      The legal authority for this search warrant application is derived from Title 18, United States Code, chapter 121, §§ 2701-11, entitled "Stored Wire and Electronic Communications and Transactional Records Access." 18 U.S.C. § 2703(c)(A) allows for nationwide service of process of search warrants for the contents of electronic communications. Pursuant to 18 U.S.C. § 2703, as amended by the USA PATRIOT Act, Section 220, a government entity may require a provider of an electronic communication service or a remote computing service to disclose a record or other information pertaining to a subscriber or customer of such service pursuant to a warrant issued using procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation.

## DEFINITIONS

10.     The following definitions apply to this Affidavit and its Attachments:

a.      The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

b.      The term "sexually explicit conduct," 18 U.S.C. § 2256(2)(A)(i-v), is defined as actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person.

c.      The term "visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion

4

into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

        d.      The term "computer," as defined in 18 U.S.C. § 1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

        e.      The term "child pornography," as defined in 18 U.S.C. § 2256(8), means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where:

        i.      the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

        ii.      such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

        iii.      such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

## FACTS ESTABLISHING PROBABLE CAUSE

11.     On 23 September 2021, I reviewed a case file from Bureau of Indian Affairs "BIA" Police Officer Jerrid Morin who responded to a call from a community member on 30 July 2021 regarding minor child T.D. ("T.D."), DOB XX-XX-2004 and minor child M.D. ("M.D."), DOB XX-XX-2006. The community member indicated T.D. and M.D. were receiving sexually explicit messages on their phones from XAVIER ASHTON BUCKLES, DOB XX-XX-

1999. Officer Morin met with T.D. and M.D. who showed Officer Morin a Facebook Messenger message from user named "Zave Ashton" stating, "You wanna know u wanna fuck me rn (emojis) I'll fuck u good rn frl (emojis) give u it deep it until I'm making u cum ony dick until im cumin inside ur sweet tight juicy pussy please (emojis)." Officer Morin took a photograph of the message which he subsequently turned over to me.

12.    I reviewed publicly available information for Facebook users named "Zave Ashton" was conducted which returned two accounts (100051024013784 and 100071203988939). My review of the publicly available information indicates both accounts appear to be used by BUCKLES. Specifically, both accounts contain the same photographs which appear to show a young boy BUCKLES identifies as his son. Account 100051024013784 shows photographs of an adult male who resembles BUCKLES from other images I have seen depicting BUCKLES and includes the page name, "xavier.buckles.3".

13.    Officer Morin also reviewed two Snapchat photos sent by BUCKLES to "T.D." and "M.D." which included sexual content. One included a male penis and the message, "If your down lol (emojis)," and the second included a drawing of a male and female engaged in sexual intercourse. There was a third message sent by BUCKLES to "T.D." and "M.D." which stated, "Lemme show u I could give u some big dick (emojis) Unlees u shy lol."

14.    On 02 August 2021, an arrest warrant was issued for BUCKLES by the Spirit Lake Tribe based on the above facts for Corruption of Solicitation of Minors in violation of section 3-7-715 of the Spirit Lake Law and Order Code.

15.    By my calculations, BUCKLES was 22 years old at the time the above messages were sent, while T.D. was 17 and M.D. was 15.

16.     On 23 February 2021, FBI SA Jacqueline Rosenow interviewed BUCKLES while

he was in custody at the Fort Totten Jail.  BUCKLES was incarcerated on tribal warrants for

domestic abuse and failure to appear, unrelated to this investigation.  Prior to the beginning of

the interview, SA Rosenow provided BUCKLES with a <u>Miranda</u> warning, after which

BUCKLES agreed to speak..  BUCKLES provided the following information as summarized by

SA Rosenow:

      a.  BUCKLES said he grew up in the residence of MAXINE BUCKLES

         ("MAXINE") with his aunts, cousins, and father, in Fort Totten, North Dakota,

         within the exterior boundaries of the Spirit Lake Indian Reservation.  BUCKLES

         was asked if he knew whether his cousin, PARRISH BUCKLES ("PARRISH"),

         exchanged drugs for sexual favors with children.  BUCKLES replied, "not with

         children."  BUCKLES was asked who PARRISH exchanged sexual favors with

         and BUCKLES said, "I'm not a snitch."  BUCKLES said there were children

         living at MAXINE's who were addicted to methamphetamine but their parents

         needed to do something to help them.

      b.  BUCKLES heard a juvenile male, hereinafter referred to as "M.B.", found notes

         inside of PARRISH's bedroom wall, BUCKLES thought these notes said

         something about trading a phone for something else. [Through this investigation, I

         have learned PARRISH's bedroom was located within MAXINE's residence.]

      c.  BUCKLE's younger brother, a sixteen-year-old juvenile male hereinafter referred

         to as "R.B.", told BUCKLES their minor cousin, fifteen-year-old juvenile female

         hereinafter referred to as "M.M.B.", went to the residence of a man named

         TYLER RAINBOW ("RAINBOW"), which I understand to be Unit 60 ½ Circle

Drive, Fort Totten, North Dakota.  When M.M.B. returned, she was walking

weird.  BUCKLES heard M.M.B. gave RAINBOW "head" for drugs. [From the

context of the interview, I believe "walking weird" was a reference to M.M.B.

just having sexual intercourse and "head" referred to oral sex.]

17.    I reviewed Spirit Lake Tribal Court documents from clerk Martina Morgan.  On

17 March 2021, BUCKLES pled guilty to a Spirit Lake Tribal charge of corruption or

solicitation of a minor.  In the statement of facts signed by BUCKLES, he acknowledged that on

or about 19 February 2021, BUCKLES and his cousin, PARRISH BUCKLES, exchanged

handwritten notes negotiating sexual acts to their minor cousins, 13-year-old juvenile female

hereinafter referred to as "C.B." and 15-year-old juvenile female hereinafter referred to as

"J.G.B."

18.    On 11 May 2021, C.B. was interviewed at the Dakota Child Advocacy Center

(DCAC) offices in Dickinson, North Dakota.  During the interview, C.B. stated when she was

approximately 11-years-old she had sex with BUCKLES and BUCKLES had her, "suck his

dick."

## REFERENCED FACEBOOK ACCOUNT

19.    Based on my training and experience, and that of other law enforcement officers

familiar with the Spirit Lake Reservation, Facebook is commonly used as a means of

communication.  Facebook can be accessed through a cellular "smart phone," but unlike

telephone calls and text messages made with cellular telephones, which require a data plan, or

"minutes," Facebook allows users to send and receive video telephone calls and messages

without a data plan as long as an internet, or wi-fi, connection is available.  The ability to send

and receive these types of calls and messages make Facebook a convenient and popular means of communication on the Spirit Lake Reservation.

20.     On 23 September 2021, I conducted online searches of Facebook for publicly available information related to Facebook accounts of BUCKLES.  Based upon my review of the publicly available information I believe the following **Subject Account(s)** are used by BUCKLES:

- **ZAVE ASHTON**, Facebook account number 100071203988939.

- **ZAVE ASHTON**, Facebook username "xavier.buckles.3", Facebook account number 100051024013784.

21.     A Facebook Preservation Request for the **Subject Account** was submitted on 23 September 2021. The Facebook Preservation Request number is 6285937 and expires on 31 December 2021.

## FACEBOOK COMMUNICATIONS

22.     Facebook owns and operates a free-access social networking website of the same name, accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the public.

23.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

24.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

26.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user

10

and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

28.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

29.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

31.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

34.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

35.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

36.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

38.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

39.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

40.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In your affiant's training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol ("IP") addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g.,

14

information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting

account information in an effort to conceal evidence from law enforcement).

41.    Therefore, the computers of Facebook are likely to contain all the material

described above, including stored electronic communications and information concerning

subscribers and their use of Facebook, such as account access information, transaction

information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

42.    Your affiant anticipates executing this warrant under the Electronic

Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of

the records and other information (including the content of communications) particularly

described in Section I of Attachment B.  Upon receipt of the information described in Section I

of Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B.

43.    Under 18 U.S.C. §2703(g), a law enforcement officer does not have to be present

for either the service or execution of the warrant.  It is sufficient for law enforcement to serve it

by fax or by mail upon Facebook, Inc.  Your affiant requests Facebook, Inc., be required to

produce the electronic communications and other information identified in Attachments A and B

hereto.  Because Facebook, Inc., is not aware of the facts of this investigation, its employees are

not in a position to search for relevant evidence.  In addition, requiring Facebook, Inc., to

perform the search would be a burden upon the company.  If all Facebook, Inc. is asked to do is

produce all the files associated with the account, an employee can do that easily.  Requiring

Facebook, Inc., to search the materials to determine what content is relevant would add to their burden.

44.     Your affiant requests that the Court authorize law enforcement agents to seize only those items identified in Attachment B from what is produced by Facebook, Inc., pursuant to the search warrant.  In reviewing these files, your affiant will treat them in the same way as if your affiant were to search a file cabinet for certain documents.  Files will be scanned quickly to determine if they are relevant to my search.  If they are, they will be reviewed.  If your affiant determines that they are not relevant, your affiant will put them aside without reviewing them in full.  This method is similar to what a law enforcement officer would do in the search of a filing cabinet or a seized computer.

45.     Under 18 U.S.C. § 2703(b)(1)(A), notice to the customer or subscriber is not required when the government obtains the contents of electronic communications using a search warrant.

46.     Under 18 U.S.C. §§ 2711(3) and 3127, this Court has the authority to issue the warrant directing Facebook, Inc., to comply even though Facebook, Inc., is not located in this district, because the Court has jurisdiction over the offense being investigated.

47.     Your affiant further requests the warrant direct Facebook, Inc., to produce records and other information pertaining to this account.  The government may obtain such records either by filing a motion under 18 U.S.C. §2703(d), or by means of a search warrant under §2703(c)(1)(A).

## CONCLUSION

48.     Based upon the information above, your affiant requests the Court issue the proposed search warrant as there is probable cause to believe that violations of Title 18 U.S.C. §

2243(a) and 1153 have been committed and that evidence of those violations are located in or associated with the Facebook account of:

**ZAVE ASHTON**, Facebook account number 100071203988939

**ZAVE ASHTON**, Facebook username "xavier.buckles.3", Facebook account number 100051024013784

and other computer servers of Facebook located at Facebook, Inc., 1601 Willow Road, Menlo Park, California, and this evidence, listed in Attachments A and B to this affidavit, which is incorporated herein by reference.

## **REQUEST FOR SEALING**

49.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for one year – until 1 October 2022.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Daniel R. Genck
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me on _____October 1_____, 2021, via telephone.

Alice R. Senechal
UNITED STATES MAGISTRATE JUDGE